UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

Pamela Harris

Defendant.

18-CR-00011

Statement of Reasons Pursuant to
18 U.S.C. § 3553(c)(2)

**JACK B. WEINSTEIN, Senior United States District Judge:**

| Parties | Appearances |
|---|---|
| For United States | Erik David Paulsen<br>Assistant United States Attorney<br>Eastern District of New York<br>271 Cadman Plaza East<br>Brooklyn, NY 11201-1820<br>718-254-6135 |
| For Defendant | Joel Cohen (Retained)<br>180 Maiden Lane<br>New York, NY 10038<br>(212) 806-5400 |
| | Jerry H. Goldfeder<br>180 Maiden Lane<br>New York, NY 10038<br>(212) 806-5400 |

**Table of Contents**

I.    Introduction ........................................................................................................................... 2
II.   Offense Pled To .................................................................................................................... 5
   A.    Count One:  Scheme to Defraud the City in 2015 ................................................... 5
   B.    Count Two:  Scheme to Defraud the City in 2016 .................................................. 6
   C.    Count Four:  Scheme to Defraud FEMA ................................................................. 7
   D.    Count Eleven:  Witness Tampering ......................................................................... 8

    E.       Additional Criminal Conduct......................................................................................8
III.  Guilty Plea .........................................................................................................................9
IV.  Specific Sentencing Issues ................................................................................................9
    A.       Videotaping......................................................................................................9
    B.       Right to Collaterally Attack Unconstitutional Sentence ............................9
    C.       Sealing ..........................................................................................................11
    D.       Revocation or Suspension of Driver's License and Registration ..........11
V.   Guidelines Range ............................................................................................................13
VI.  Law ....................................................................................................................................14
VII. 18 U.S.C. § 3553(a) Considerations ...............................................................................15
VIII.Sentence ...........................................................................................................................20
IX.  Conclusion ........................................................................................................................23

## I.   **Introduction**

       This tragic case presents complex and difficult sentencing issues.  The defendant, Pamela Harris, is a former New York State Assemblywoman—a position she resigned from when threatened with the instant prosecution.  She has suffered extraordinarily harsh and repeated blows:  as a teenager, an abusive mother who beat her with a belt at least twice a week resulted in her leaving her family home and dropping out of high school; she never met her biological father; the unexpected death of her only child was followed by a period of despair when she was living on the street, addicted to crack cocaine and prostituting herself to support her drug habit; a brutal beating by an inmate while she worked as a corrections officer in Riker's Island prison created great pain and stress; diagnosed with breast cancer at 44, she underwent a radical mastectomy and three invasive reconstructive surgeries; a car accident required multiple surgeries; and she is burdened with diabetes and other serious medical problems.

       Harris has exhibited a remarkable capacity to rehabilitate herself:  she earned a G.E.D. in 1995, an associate's degree in 2004, a bachelor's degree in 2007, and a master's degree in 2013. She became a leader in the Coney Island community, particularly in instructing children and steering them away from criminal conduct; and universal respect resulted in her election as an

assemblywoman. She married a supportive husband and maintained good relations with all her family. She is sincerely remorseful for her crimes.

The likelihood of criminal behavior in the future is low. The probability of her assisting people in the community, and ex-convicts, is high.

Her crimes are serious. They reflect a pattern of deliberate and calculated criminal behavior from 2012 to 2017. She executed various schemes to defraud the public of funds allocated for vulnerable members of society: she stole $45,600 in City funds from a not-for-profit organization she ran for at-risk adolescents in Coney Island and $24,800 in federal flood disaster relief funds set aside for individuals displaced from their homes by Hurricane Sandy. She defrauded bankruptcy creditors of $10,000. She forged signatures and submitted fabricated documents to City and federal agencies. She interfered with the prosecution of her crimes by inducing people to commit perjury.

Harris did not use her position as an elected official to execute her crimes. But, by continuing to engage in criminal conduct while she served in the Assembly, she contributed to the erosion of the public's faith in government. *Cf.* Jeet Heer, *New York is the Most Politically Toxic Place in America*, The New Republic (May 9, 2018), https://newrepublic.com/article/148337/new-york-politically-toxic-place-america (describing a culture of corruption in New York State politics).

Deviation from defendant's prior law-abiding conduct is so great as to suggest that she is still suffering from the psychic scars of her dreadful past. *See United States v. Rivera*, 281 F. Supp. 3d 269, 288 (E.D.N.Y. 2017) (finding that the defendant's "upbringing[] and mental health status serve as mitigating factors for sentencing"). She is unlikely to receive adequate treatment in prison for her past traumas and mental and physical medical problems, exacerbating her

suffering in a long painful incarceration.  Emily Frances Musson, Comment, *Cruel & Unusual Pathways to Crime: A Call for Gender– And Trauma–Informed Correctional Care*, Brook. L. Sch., 26 J.L. & Pol'y 713, 727 *passim* (2018) (discussing the need to reform correctional mental health care to taking trauma and gender into account).

As a former prison guard, she is likely to be in danger from some inmates.  *See*, *e.g.*, *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (holding that "extreme vulnerability of a criminal defendant [in prison] is a proper ground for departure"); *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006) (affirming downward departure based on former prison guards' susceptibility to abuse in prison which was compounded by public and emotional outrage at offense); *United States v. D.W.*, 198 F. Supp. 3d 18, 146 (E.D.N.Y. 2016) (finding that the defendant's "high risk of being abused while incarcerated . . .  would compound [his] already serious mental health problems, making readjustment upon his eventual release from custody less likely").  Harris has a better chance at rehabilitation on the outside than on the inside of a prison.

On the one hand, the Guideline for incarceration of thirty-three to forty-one months is too severe in this unique case.  A long incarceratory Guideline sentence might well destroy defendant's ability to rejoin her free community and to exercise her capacity for helping people.

On the other hand, a sentence of no incarceration might send a wrong message to the community.  *Cf.*  James S. Bowman, *Ethics in Government: A National Survey of Public Administrators*, 50 Pub. Ad. Rev. 345, 345 (1990) ("[T]he citizenry has come to expect higher standards [in public officials] . . ..  People must have confidence that [government] will protect the public interest, since representative democracy rests on officials and the trust they engender."); Jerome Michael & Herbert Wechsler*, A Rationale of the Law of Homicide II*, 37

Colum. L. Rev. 1261, 1307 (1937) ("[H]ow lenient can we be . . . without risking nullification . . . because [people] regard the penalty as too lenient."). Government officials have an obligation to demonstrate high ethical conduct. If we are to survive as a democracy under the rule of law, people must retain faith in the honesty of their representatives.

Harris is sentenced to a term of imprisonment of six months, restitution payment for all the money she stole, community service, and strict supervised release of three years. *See, infra*, Part VIII (discussing the sentence in detail).

Sentencing is at the heart of federal criminal law. There are few trials; the parties are encouraged to seek guilty pleas. Robert J. Anello and Richard F. Albert, *The Vanishing Federal Criminal Trial*, N.Y.L.J., Oct. 11, 2018 (quoting former United States District Judge for the Eastern District of New York John Gleeson) ("Once the centerpiece of our criminal justice ecosystem, the trial is now spotted so infrequently that if we don't do something to bring it back, we will need to rethink many other features of our system that contribute to fair and just results only when trials occur in meaningful numbers."). The present case illustrates some of the difficulties in sentencing based on a plea of guilty and wide discretion of the trial judge.

## II. Offense Pled To

### A. Count One: Scheme to Defraud the City in 2015

Defendant served as the Executive Director of the not-for-profit organization Coney Island Generation Gap ("CIGG"). PSR ¶ 117. It worked well to inspire youngsters. It introduced teenagers and young adults in the community to media arts and provided them with training and mentoring services. *Id.* ¶ 10.

But, beginning sometime before 2014, defendant began to steal CIGG's funds. *See id.* ¶¶ 19–25. She applied for and was awarded $58,750 in New York City Council discretionary

funds to support CIGG's work in the fiscal year 2015. *Id.* ¶¶ 19, 22. These funds were administered by the New York City Department of Youth and Community Development ("City"). *Id.* ¶¶ 12, 20.

Before receiving money, CIGG was required to detail its intended use. *Id.* ¶ 20. Harris falsely represented that CIGG was going to use $22,800 to rent a studio in Coney Island for operations. *Id.* In support of the application, Harris created a fake rental agreement, forging the landlord's signature, and submitted the fraudulent agreement to the City. *Id.* ¶¶ 21–22.

Based on the defendant's false representations, the City deposited funds into CIGG's account in March 2015. *Id.* ¶ 23. Harris then misappropriated the purported rent payments. *Id.* She wrote a check to herself for $22,800 from CIGG's account, deposited the check into her personal account, and used the money for personal expenses—including online shopping bills, her own home mortgage payments, and airline and cruise tickets. *Id.* To conceal her fraud, she submitted a program expense report in July 2015, in which she falsely represented that the funds had been paid to the studio's landlord for "rental space." *Id.* ¶ 24.

Defendant stole $22,800 in fiscal year 2015. *Id.* ¶ 25.

### B. Count Two: Scheme to Defraud the City in 2016

Defendant continued to defraud the City after her election to the New York State Assembly in November 2015. *See id.* ¶ 9, 26. She had the assistance of a co-conspirator, the new Executive Director of CIGG. *Id.* ¶ 26; Ltr. from Assistant United States Attorney ("Gov't's Br.") at 4, ECF No. 24, Oct. 4, 2018.

In April 2016, as part of the application process for discretionary funding for 2016, defendant helped falsely represent that CIGG would use $11,400 to rent a studio apartment. PSR ¶ 26. A forged lease agreement and a falsified program expense report were submitted.

*Id.* ¶¶ 26–27.  CIGG never rented the studio.  *Id.* ¶ 28. Instead, the $11,400 was paid to the defendant in cash.  *Id.*

CIGG falsely represented to the City that it had used $18,750 of its discretionary funding for 2016 on stipends for children participating in its programs.  *Id.* ¶ 27.  In October 2016, after the defendant became aware of a pending federal grand jury investigation, she created false documents, purportedly signed by the adolescents after receipt of their stipends.  *See id.* ¶ 27; Gov't's Br. at 4.  Although a few adolescents received cash from CIGG, the signatures of many were forged, and most received nothing.  *See* PSR ¶ 28.  The majority of funds earmarked for stipends, approximately $11,400, were diverted to Harris in cash.  *Id.*

Defendant stole $22,800 of the $33,425 awarded to CIGG for fiscal year 2016.  *Id.*

### C.  Count Four:  Scheme to Defraud FEMA

The defendant and her husband live in a three-story, one-family residence they own in Coney Island.  *Id.* ¶ 30.  Like many residents, defendant's home was damaged when Hurricane Sandy struck in 2012.  Gov't's Br. at 5.  Harris capitalized on the federal government's response to the disaster, exploiting the FEMA relief assistance program intended for housing of individuals temporarily displaced from their homes.  *See* PSR ¶ 34.

Harris claimed that she needed financial assistance to cover the cost of temporary housing.  *Id.* ¶ 31.  From December 2012 to January 2014 she submitted leases and receipts to FEMA stating that she and her husband were renting the first floor of her sister's home in Staten Island for approximately $1,550 a month.  *Id.* ¶¶ 31–32; Gov't's Br. at 5; Sentencing Memorandum of Pamela Harris ("Def.'s Br.") at 45, ECF No. 25, October 4, 2018.  The representations were untrue.  *See* PSR ¶ 33.  She and her husband were not forced to relocate, did not live with her sister, and never paid her sister any rent.  *Id.*; Gov't's Br. at 5.  She forged her

sister's signature and submitted the fraudulent leases and receipts to FEMA.  PSR ¶ 33; Gov't's

Br. at 5.

Based on false representations to FEMA, defendant stole $24,800. PSR ¶ 34.

### D.  Count Eleven:  Witness Tampering

Defendant became aware of the government's investigation of her criminal conduct

sometime after receipt of a federal grand jury subpoena in July 2016.  *See* Gov't's Br. at 6; PSR

¶ 46.  As the investigation progressed, she took steps to impede it by instructing witnesses to lie

and submit false documents.  PSR ¶ 47–48.  She convinced her sister and brother-in-law to lie to

FBI agents that she lived at their Staten Island residence for a year and paid them $1,500 a month

in rent.  *Id.* ¶ 47; Def.'s Br. at 46.  At her request, agents were supplied by a co-conspirator with

a letter containing a fabricated explanation for the use of the discretionary funds stolen from

CIGG.  *See* PSR ¶ 48.

### E.  Additional Criminal Conduct

As part of the plea agreement, the government agreed to dismiss charges for an alleged

scheme to defraud the United State Bankruptcy Court.  *See* Sent. Hr'g Tr. 21:4–6, Oct. 12, 2018;

PSR ¶¶ 42–45.  Harris hid funds in connection with a bankruptcy petition she and her husband

filed in 2013.  PSR ¶ 45.  She failed to disclose an account holding $10,000.  *Id.*  She also lied

under oath to the bankruptcy trustee that she was receiving financial assistance each month from

her sister.  *See id.* ¶ 44; Def.'s Br. at 41.  The entire $10,000 has been repaid by Harris.  Gov't's

Br. at 8.

The government dismissed charges alleging that the defendant submitted fraudulent

claims to other organizations providing relief to Hurricane Sandy victims.  *See* PSR ¶ 35–41;

PSR Add. at 2; Sent. Hr'g Tr. 21:4–6, Oct. 12, 2018.  She submitted fabricated documents,

including fraudulent leases, receipts, and invoices, as part of these schemes. *See* PSR Add. at 2.

The amounts she obtained, if any, are not included in the court's restitution order.

### III.    Guilty Plea

In June 2018, Harris pled guilty to four of the eleven counts in the indictment: two counts of wire fraud in connection with her scheme to defraud New York City, 18 U.S.C. § 1343; one count of disaster relief fraud in connection with her scheme to defraud FEMA, 18 U.S.C. §§ 1040(a)(2), (b)(1), (b)(2), and (b)(3); and one count of witness tampering, 18 U.S.C. § 1512(b)(3). PSR ¶¶ 1–5.

The government has refused a 5K1 letter for useful cooperation, though Harris apparently ultimately did tell the truth about her crimes.

### IV.    Specific Sentencing Issues

A Fatico evidentiary sentencing hearing was conducted. A number of rulings on applicable sentencing law were made in connection with the sentencing. They are discussed below.

#### A.  Videotaping

On consent, the proceeding was videotaped to record body language of defendant and her family in court. *See In Re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) ("The sentencing hearing normally requires that the defendant be observed for credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers of incarceration, and a myriad other relevant factors. . . . A judge applies mental impressions of many tangible and intangible factors when imposing a sentence. Many of these factors do not appear in the transcript.").

#### B.  Right to Collaterally Attack Unconstitutional Sentence

The defendant's waiver of the right to make a collateral attack on her sentence was deemed by the court stricken from the plea agreement.

A collateral attack on a federal sentence is made by motion pursuant to 28 U.S.C. § 2255. It commences what is essentially a habeas corpus proceeding that permits the defendant to challenge the constitutionality of the sentence. *See* 28 U.S.C. § 2255.

An agreement not to appeal a sentence is enforceable to the extent that the Court of Appeals for the Circuit permits. *See United States v. Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir.) (per curiam), *cert. denied*, 509 U.S. 931 (1993).

But, an agreement to give up the right to make a collateral attack under section 2255 should not be allowed by the district court. A defendant may not be forced to give up the right not to be sentenced on the basis of constitutionally impermissible factors. *See United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994) (holding that the defendant's waiver of his right to appeal his sentence in his plea agreement does not "waive[] the right to appeal from an arguably unconstitutional use of naturalized status as the basis for a sentence"); *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992) ("[A] defendant could not be said to have waived his right to appellate review of a sentence ... based on a constitutionally impermissible factor such as race."); *Blackledge v. Perry*, 417 U.S. 21, 31 (U.S. 1974) (finding that the defendant's guilty plea did not foreclose him from raising a constitutional claim in a federal habeas corpus proceeding on the grounds of prosecutorial vindictiveness); *United States v. Lloyd*, 901 F.3d 111, 118 (2d Cir. 2018) ("An appeal waiver included in a plea agreement does not bar challenges to the process leading to the plea" that render the plea involuntary and unknowing.); *but see Tollett v. Henderson*, 411 U.S. 258, 269 (1973) (holding that when a state criminal defendant has pled guilty to the offense for which he was indicted by the grand jury, he cannot in a later federal

habeas corpus proceeding raise a claim of discrimination in the selection of the grand jury); *Class v. United States*, 138 S. Ct. 798, 805 (2018) ("A valid guilty plea also renders irrelevant—and thereby prevents the defendant from appealing—the constitutionality of case-related government conduct that takes place before the plea is entered."). The issue is discussed at length in the court's forthcoming opinion in *United States v. Chua*, 17-cr-000016.

Accordingly, over the government's objection, waiver of rights under section 2255 is deemed stricken. *See* Sent. Hr'g Tr. 3:22–6:7, Oct. 12, 2018.

### C. Sealing

The court ordered exhibits filed sealed by defendant to remain sealed. Defendant had filed letters supporting defendant under seal to eliminate juvenile's names from the public record. The court allowed the sealing, but ordered redacted versions filed unsealed, to conceal the names of minors. *Id.* at 3:1–13.

There is a strong presumption of public access to letters of support and other documents submitted in connection with a sentencing. *See United States v. Alcantara*, 396 F.3d 189, 198–99 (2d Cir. 2005) ("Access to sentencing proceedings—and to guilty plea proceedings—is particularly important because most cases do not go to trial."); *see also United States v. Munir*, 953 F. Supp. 2d 470, 474–475 (E.D.N.Y. 2013) (summary of the law governing access to judicial documents). The public has a right to see sentencing documents the court reads when it sentences a defendant unless there are special circumstances, such as danger to persons. *See* Fed. R. Crim. P. 49.1(a) (setting out what individually identifying information may be redacted from public filings).

### D. Revocation or Suspension of Driver's License and Registration

Harris faces a broad range of collateral consequences because of her felony convictions, including possible revocation or suspension of her driver's license and car registration.

The New York Vehicle and Traffic Law allows for revocation or suspension of licenses and registrations upon a criminal conviction, including: (1) mandatory revocation of licenses for those convicted of crimes related to the operation of a motor vehicle, N.Y. Veh. & Traf. Law § 510(2)(a); (2) six-month mandatory suspension of licenses for those convicted of drug-related offenses, absent compelling circumstances, *id.* at § 510(2)(b)(v); *see* 23 U.S.C. § 159 (federal law makes a portion of highway funding dependent on states adopting a six-month mandatory suspension for drug crimes); and (3) permissive revocation of licenses and registrations for those, like Harris, convicted of a felony, N.Y. Veh. & Traf. Law at § 510(3)(c). The statutory power to revoke or suspend is given by the State to judges, the State Police Superintendent, and the Commissioner of Motor Vehicles. *Id.* at § 510(1).

The court finds no incompatibility with federal concerns in the statute's restrictions on persons convicted of crimes involving the operation of a vehicle. But, for other crimes, it seems questionable for a State authority to interfere with the sentencing functions of a federal court trying to protect the community as well as the defendant.

This court will not, in the present case, issue, or recommend, a revocation or a suspension of the defendant's driving license or registration. It respectfully recommends that no such revocation or suspension be ordered by a State authority against Pamela Harris.

Federal courts are rightly concerned with the ability of those convicted to earn a living. *United States v. Doe*, 79 F.3d 1309, 1319 (2d Cir. 1996) ("[W]e carefully scrutinize unusual and severe conditions, such as one requiring the defendant to give up a lawful livelihood.") (internal quotations omitted); *United States v. Jenkins*, 854 F.3d 181, 195 (2d Cir. 2017) (vacating condition of supervised release where "the nature of these employment restrictions mean that, as a practical matter, he may never be employable").

Loss of a driver's license may prevent a person from getting a job; it makes it difficult to commute and impossible to obtain a job requiring a driver's license or certificate of ownership of a vehicle. *See* Jonathan Oberman & Kendea Johnson, *The Never Ending Tale: Racism and Inequality in the Era of Broken Windows*, 37 Cardozo L. Rev. 1075, 1085 (2016) ("In New York, misdemeanor convictions for controlled substance offenses and marijuana offenses, regardless of the sentence, require a license suspension of six months. Driving is often a required condition of employment, especially in the service industry, such as taxi and limousine services, food delivery, or package delivery. The inability to drive makes work impossible for any employee for whom driving is a job requirement.").

In view of the strong public policy to assist those convicted to be employed, and the need for employment in rehabilitation, it may be useful for the State to revisit section 510 of the N.Y. Veh. & Traf. Law. Similarly, the United States may find it helpful to reconsider section 159 of Title 23.

## V. Guidelines Range

The defendant's base offense level is 7. PSR ¶ 59. Six levels were added because the loss exceeded $40,000. *Id.* ¶ 60. A series of additional upward enhancements were applied: two points because the offense involved a misrepresentation or fraud during the course of a bankruptcy proceeding; two points because the fraud was in connection with major disaster or emergency benefits; two points for her role as the organizer and leader in the scheme to defraud; two points for abusing a position of public trust; and two points for obstruction of justice. *Id.* ¶¶ 62–66; Sent. Hr'g Tr. 11:9–18, Oct. 12, 2018; Gov't Br. at 2. Pamela Harris's adjusted offense level is 23. PSR ¶ 67.

Upon a factual finding of this court, the offense level was reduced by two points for acceptance of responsibility. *See* Sent. Hr'g Tr. 17:23–18:7, Oct. 12, 2018. The offense level was further reduced by one point for timely notification of an intended guilty plea. PSR ¶ 81. The total adjusted offense level is 20. Sent. Hr'g Tr. 12:9–11, Oct. 12, 2018; PSR ¶ 82. Defendant has a criminal history category of I (the lowest category) because she has no criminal record. Sent. Hr'g Tr. 12:9–11, Oct. 12, 2018; PSR ¶ 86. The guideline imprisonment range is 33 to 41 months. Sent. Hr'g Tr. 12:9–11, Oct. 12, 2018; PSR ¶ 135.

## VI.    Law

The Sentencing Guidelines are "now advisory, rather than binding." *Rita v. United States*, 551 U.S. 338, 361 (2007) (Stevens, J., concurring). The district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). In making this determination, the court "may not presume that the Guidelines range is reasonable. He [or she] must make an individualized assessment based on the facts presented." *Id.* at 50.

If the sentence departs from the Guidelines, the court shall indicate the reasons for imposing a different sentence. *See* 18 U.S.C. § 3553(c)(2). These reasons must be stated in open court, as well as "with specificity in a statement of reasons." *Id.* The court's written reasons can be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under §3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), abrogated in part on other grounds by *Kimbrough v. United States*, 552 U.S. 85 (2007).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is encouraged. *See*, *e.g.*, *United States v. Santiago*, No. 16-CR-615, 2017 WL

2462537, at *2 (E.D.N.Y. June 6, 2017); 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, *The Growth of Incarceration in the United States*, Exploring Causes and Consequences 23 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

## VII.  18 U.S.C. § 3553(a) Considerations

Consideration of the relevant sentencing factors warrants a downward departure from the guidelines.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220 (2005).

Harris is a 58 year old life-long resident of Brooklyn with no prior criminal conviction. PSR ¶¶ 83,91, 99.  Her home life was difficult during adolescence.  She grew up during the 1960s and '70s, in a low-income tough neighborhood in Brooklyn.  *See id.* ¶¶ 91–92; Def.'s Br. at 8.  She was raised in an exceptionally strict household by her mother, a former occupational therapist, who is now deceased.  *See* PSR ¶¶ 91–92.  Her mother would beat her at least twice a week with a belt whenever she did not do assigned chores or missed a curfew.  *Id.* ¶ 92.  Her biological father was absent.  *Id.* ¶ 91.

Harris—although a bright student—dropped out of school at 16 because she was in danger of being held back for missing too many classes.  *Id.* ¶¶ 112–113.  By 17, she had moved out of her home because of her strained relationship with her mother.  *Id.* ¶ 92.  (Later in life they had maintained a close relationship until her mother's death).  *Id.*

She has a twin sister, an occupational therapist living in Staten Island who is married with three children, and an older brother, a supervisor at the Metropolitan Transit Authority in Staten Island who is married with five children.  *Id.* ¶ 93; PSR Add. at 3.  She has two maternal half siblings.  PSR ¶ 93; PSR Add. at 3.  All siblings remain supportive.  PSR ¶ 93

Harris has been married to a 63 year old boiler mechanic since 1997. *Id.* ¶ 97. They live in a three-level attached home in a middle-income, residential neighborhood in Coney Island. *Id.* ¶ 99; Def.'s Br. at 37. Her husband has three children from past relationships. PSR ¶ 97. He and his children are supportive of the defendant. *Id.*

The defendant has no children. As previously noted, she had a daughter from a previous marriage who died in 1983 at the age of four. *Id.* ¶ 95. The child passed away in her sleep while being cared for by the defendant's mother; the cause of death is unknown. *Id.*; Def.'s Br. at 9.

Harris spiraled down after the death of her only daughter. She suffered from depression and began using crack cocaine and marijuana. PSR ¶ 96. Her relationship with her first husband fell apart. *Id.* ¶ 95. They separated. *Id.* She lived on the streets, became addicted to crack cocaine, and engaged in prostitution to support her drug habit. *Id.* ¶ 96.

In 1989, over five years after the death of her daughter, Harris pulled herself together and sought help. *See id.* She enrolled in an inpatient substance abuse treatment program. *Id.* She regained control of her life and no longer used drugs. *Id.* She moved in with her now-husband and obtained lawful employment as a bus driver. *Id.* ¶ 120; Def.'s Br. at 9. She went back to school, receiving her G.E.D. in 1995, her associate's degree in 2004, her bachelor's degree in social work in 2007, and her master's degree in human behavior studies in 2013. PSR ¶¶ 112–113.

In 1997, Harris became a corrections officer for the New York City Department of Corrections ("DOC") on Riker's Island, where she worked for ten years until retirement. *Id.* ¶ 119. In the prison, she was attacked by an inmate and sustained serious injuries requiring surgery. *Id.* ¶ 102. Because of this incident, she may be suffering from a form of post-traumatic stress. *Id.* ¶ 106. She took medication and visited a psychiatrist once a week for seven years to

treat this disorder. *Id.* The defendant left the DOC in 2006, on a disability pension of $3,900 a month, which she was required to give up when she joined the State Assembly in 2015; it will be restored. *Id.* ¶¶ 118, 124.

The defendant was diagnosed with cancer in 2004. *Id.* ¶ 103. She had a radical mastectomy and breast reconstruction surgery, which had to be modified in two subsequent surgeries. *Id.* Her cancer is currently in remission. *Id.* She has also been diagnosed with diabetes and a hereditary blood disorder. *Id.* ¶¶ 101, 104. She was in a car accident requiring rotator cuff surgery and treatment for pain in her arm. *Id.* ¶ 102.

Harris was elected as a New York State Assembly Member in November 2015, representing several neighborhoods in south Brooklyn, including Coney Island. *See id.* ¶ 9. She voluntarily resigned on April 2, 2018 because of her indictment. *See id.*

Defendant has been an active volunteer in her community. As the executive director of CIGG, she mentored youths and provided opportunities for at-risk children to engage in recreational activities. *See id.* ¶ 10. She and her husband opened their house as a home base for children in the neighborhood, giving them a safe place to come to after school and on the weekends. *See*, *e.g.*, Sent. Hr'g Tr. 25:2–18, Oct. 12, 2018. Her husband helped Harris on CIGG projects. *See id.* at 23:5–14. Neither he nor she was paid for their work with CIGG. *See id.*; PSR ¶ 117.

The defense submitted numerous letters in support of the defendant's moral character from her family, members of her community, and a rabbi. *See* Def.'s Br. Ex. App., ECF No. 26, Oct. 4, 2018. These letters spoke to her fine reputation as a leader in the community and as someone always seeking to help others. *See id.* They described her important role as a leader of young people, and the good works CIGG did by providing children with a safe, educational, and

productive environment to develop their interests and goals. *See id.* Many people stressed the need for her to continue her work with adolescents in Coney Island. *See id.* These sentiments were echoed by several youths who were helped by CIGG, as well as by other members of the community, in video testimony presented at sentencing. Sent. Hr'g Tr. 28:10–38:25, Oct. 12, 2018.

Since July 30, 2018, the defendant has been volunteering with The Fortune Society, a well-known and respected non-profit organization. It supports successful reentry after incarceration and advocates for alternatives to prison. At sentencing, Joanne Page, president and CEO of Fortune Society spoke about Harris's ability to connect with young people in the criminal justice system and the positive impact she can have in the future on these individuals "who are at a crossroads in their life." Sent. Hr'g Tr. 42:8–19, Oct. 12, 2018.

> [The Fortune Society] offer a whole array of services. We have housing. We have mental health license treatment, drug treatment, employment services, a whole array of services, but when I spoke with Ms. Harris, it was the alternative to incarceration program that I felt she could be most useful in. . . .
>
> She brought several things that made me feel very strongly that she could make a difference to them. The fact that she herself had experienced addiction and homelessness, pulled herself out of it, been a leader in the community became an Assembly women is proof to these young people that it's possible to pull yourself out of it. The fact that she then fell so hard and now was having to do community service with us is also part of the lesson we try to teach these young people that you're accountable or what you do, that you can lose everything you've got if you engage in criminal behavior but also that there's room for redemption; that it's possible to come back; that it's possible to give back and we try to teach them the value that if you've done damage to the community, your job is to undo that damage and to the extent that we can have role models of people who themselves are facing sentences and are trying to build back by giving back, that can make a difference in a young person's life.
>
> I always look at risk when I look at somebody that might be working with our young people and the question I always ask is why can we trust this person and what made me feel good about Pam working with them was a long, long, long track record of loving kids and being there for them; pretty much a lifetime track

record. The fact that she was a crime victim, that she was assaulted so seriously that she still suffers the consequences and yet chose to work with high-risk and at-risk young people after that may have [made] me feel good about having her work with our kids because she kind of embodied being at bottom, pulling yourself up, doing things that then tear that whole thing down, but still having qualities of carrying and solidity and being there for young people. . . .

[T]his is somebody who can bring value and increase the odds of our kids and whatever happens she may well be somebody we would like to hire and bring in because we think she can make a difference. We feel strongly that if somebody does damage, the response should be to let them undo that damage by doing good and we've seen her do that in the time that she's been with us.

*Id.* at 42:8–45:10.

William Beale, Senior Director of Alternative to Incarceration Services and the defendant's [immediate] supervisor, testified about her positive contributions to Fortune Society clients. He has observed the defendant take responsibility for her crimes and demonstrate a willingness to openly share her remorse with individuals in the program.

I work with Ms. Harris every day she's . . . at the program and during supervision one of the most important things is we speak about the work she's doing and how she impacts our program and one thing she always says is, I let people down and I messed up. She speaks about that every time and I see how she's remorseful every day and more than anything else she feels like she let the world down, other people, and she's thinking about everyone else that she can be helping.

She does workshops with our clients and she has a very positive energy, very positive impact on everyone and she uses her experience and her mistakes as a tool to help others. She's told her story to a lot of young people and they were in shock. Oh, you really -- that's why you're here and she said yeah and she's trying to prevent them from heading down that road and she is using that as a positive and not too many people can come in and use a mistake and use some things that they've done wrong and admit it and feel remorse and use it as a tool for positive to outcome for others.

She brings a positive energy that most people don't have and I think she . . . found a place and a home that she can be welcomed and she can use her experience for good. And she's been doing that ever since she's been . . . with our program. She's been [in] that for months and I'm very impressed by how she interacts with people, . . . but our program doesn't have an age limit so she reaches older people. . . . [S]he's good with people and she has a positive impact on them. They come and ask, is she going to stay, is she going to be here for a long time? . . . I don't

know what's going to happen, but I say hopefully she will be with us a while where we will be able to benefit from her energy and her lessons that she's teaching our people.

*Id.* at 45:18–46:25.

**VIII.    Sentence**

The defendant is sentenced to a term of six months incarceration and three years of supervised released—on all four counts, concurrent.

She shall perform 400 hours of community service over a one-year period following incarceration.  The literature suggests that this substantial community service requirement is appropriate.  *See*, *e.g.*, Colby Hamilton, *Berman Defends 'Reasonableness' of Community Service Sentence*, N.Y.L.J., Mar. 23, 2018; U.S.S.G. 5F1.3 cmt. n. 1 (The Sentencing Guidelines recommend that "[c]ommunity service generally should not be imposed in excess of 400 hours.").

A $400 ($100 per count) special assessment is imposed.  No fine is levied because defendant does not have sufficient assets to pay one.

Restitution is ordered in the amount of $45,600 to be paid to the City and $24,800 to be paid to FEMA.  Payment to the Clerk of the court for restitution is due six months after defendant is released from prison at an amount equal to 10% of her net after-tax income.  Her pension is included in earnings, but not her social security disability or other benefits.  An application may be made to modify defendant's payments as her economic situation changes.

An order of forfeiture to the United States was entered in the amount of $10,000 in connection with funds hidden from the bankruptcy trustee.  *See* Order of Forfeiture, ECF No. 21, Sept. 14, 2018.  The defendant has paid that amount in full.

The court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). The sentence imposed reflects the seriousness of the defendant's crimes, requiring incarceration, and will promote respect for the law and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

The crimes committed are serious. Harris repeatedly lied and submitted forged documents to divert public funds reserved for youth and disaster victims into her own pocket. She stole from the children she was supposed to be protecting. She stole from natural disaster victims. When the government focused on her various schemes to defraud, she took advantage of those closest to her by convincing them to lie.

The defendant's crimes were not an aberration. They reflect a pattern of calculated fraudulent behavior over a number of years. She is a thoughtful, intelligent, and highly competent person. She did not stumble into her crimes but deliberately walked into them with her eyes wide open.

The people have the right to expect a high degree of moral rectitude in their State legislators, even if what they did is not done using their legislative power. The court is mindful of its responsibility to assure the public that those in positions of power receive appropriate punishment for their crimes.

Consideration must be given to defendant's difficult background and her strong and effective efforts to improve herself and society. Harris pulled herself up after hitting bottom following the death of her only daughter. She wrenched herself off the street and off drugs; she went back to school, earning a G.E.D., and a bachelor's and a master's degree. She maintained lawful employment as a corrections officer until retirement. She suffered post-traumatic stress, requiring medication and therapy, after being brutally attacked by an inmate at Riker's Island

prison.  She survived a serious auto accident, breast cancer, and a radical mastectomy, and she has been diagnosed with other serious diseases.

Numerous witnesses testified at sentencing regarding her role as a leader in her community and the positive impact she has had on them and others.  She has demonstrated that she can be an effective mentor for at-risk youths in Coney Island, helping them stay out of trouble and on the path towards a lawful life.

Her husband has helped defendant get back on her feet.  He is able to help her again.

In view of the defendant's unique, tragic personal history, her extraordinary capacity for rehabilitation, and the important role she can serve in her community, as well as the fact that her crimes were not committed with the power of her public office, a term of imprisonment longer than six months is not required.  The term is just.  *See, e.g., Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").  The emotional and psychic stress of her repeated traumas serves as a mitigating factor.  So too does her vulnerability to abuse in prison by other inmates as a former corrections officer.

General and specific deterrence are achieved by the sentence imposed.  She voluntarily resigned from public office.  Harris has expressed remorse for her conduct and understands the gravity of her actions.  Time in prison, close supervision after release, and restitution provide sufficient deterrence.  In addition to the punishments imposed by this court, she has lost some of the respect of her community which she desperately sought.  Given her age, lack of prior

criminal history, and the support she receives from her family and friends, she presents a low risk for recidivism.

The defendant will be subject to extensive, intense monitoring by the Probation Department while on supervised release. The mandatory conditions of U.S.S.G. § 5D1.3(a) and standard conditions of U.S.S.G. § 5D1.3(c) are imposed. A full financial disclosure condition is imposed. *See* U.S.S.G. § 5D1.3(d)(3). Defense counsel agreed that the detailed requirements of her supervised release explained to her by a probation officer after sentencing are appropriate.

Probation may move for termination of supervised release on behalf of the defendant after one year if she demonstrates substantial grounds for believing she is rehabilitated. It may apply for modification or clarification of supervised release terms at any time. Defendant may also apply for modification, clarification, or termination at any time.

## IX. Conclusion

All relevant elements of the Guidelines and statutes have been considered. This sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

SO ORDERED.

*Jack B. Weinstein*

Jack B. Weinstein
Senior United States District Judge

Date:   October 24, 2018
        Brooklyn, New York